# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Michael T. Mason | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 809 | **DATE** | 9/5/2002 |
| **CASE TITLE** | Lesley Stephens vs. City of Chicago et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   For the reasons stated in the attached Memorandum Opinion and Order, defendant's motion for summary judgment as to the City of Chicago and Rick Santella [202-1] is granted in part and denied in part. Defendant's motion for summary judgment [202-1] is granted as to Eileen Joyce and Adrienne Kane. Eileen Joyce and Adrienne Kane are hereby terminated as parties to this litigation. Ruling on defendant Urian's motion for summary judgment to follow shortly. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | SEP 06 2002 | |
| | Notified counsel by telephone. | date-docketed | 253 |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 9/5/2002 | |
| KF | courtroom deputy's initials | date mailed notice | |
| | | KF | |
| | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



LESLEY STEPHENS,                    )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )     No. 98 C 809
                                    )
CITY OF CHICAGO, a municipal        )     Mag. Judge Michael T. Mason
corporation; RICK J. SANTELLA; RUDY )
URIAN; EILEEN JOYCE; and ADRIENNE   )
KANE,                               )
                                    )
        Defendants.                 )

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Plaintiff Lesley Stephens has been employed in various capacities by defendant City of Chicago ("City") since 1979. He filed this lawsuit against the City as well as several of its employees, Rick Santella,[1] Rudy Urian,[2] Eileen Joyce[3] and Adrienne Kane,[4] alleging that he was discriminated and retaliated against in violation of 42 U.S.C. §§ 1981 and 1983, and also in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*, and that he was denied certain First Amendment rights because of unlawful political patronage. Specifically, Stephens alleges that he was denied sixteen different promotions, subjected to racial harassment, and given unfair disciplinary suspensions. Defendants

---

[1] At the time the lawsuit was filed, Santella held the position of Commissioner of Fleet.

[2] At the time the lawsuit was filed, Urian held the position of Deputy Commissioner of Fleet. He filed a separate motion for summary judgment and thus is not part of this decision.

[3] At the time the lawsuit was filed, Joyce held the position of Executive Assistant to the Commissioner of Fleet.

[4] At the time the lawsuit was filed, Kane held the position of Employee Relations Supervisor at Fleet.

253

Santella, Joyce, Kane, and the City have filed a motion for summary judgment. For the following reasons, we grant in part and deny in part the City's motion and Santella's motion, and grant the motions of Joyce and Kane in their entirety.

**Statement of Facts**

Stephens' employment history with the City is long and complex, and the parties' Rule 56.1 Statements of Undisputed Fact have at times impeded more than aided the Court in determining exactly how that history unfolds. Between them, the parties have filed over 900 separate statements of undisputed fact, each of which cites to numerous exhibits and other documentary evidence. This evidence is bound in eleven different documents – some created specifically for this motion and some for earlier motions before the Court. Some of the documents identify exhibits by letters and some by numbers (so, for example, there might be three different exhibits known as "A", or more than one exhibit numbered "12"). Further, both parties are guilty of referring the Court to depositions that are located in multiple places within these documents without specifying exactly where a particular page is, forcing the Court to comb through dozens of pages to determine whether a statement is admitted or denied.[5]

Further, in denying parts of defendants' Rule 56.1 statement, plaintiff – in over 100 different paragraphs – referred the Court to its own Rule 56.1(b)(3) statement of additional

---

[5] For example, plaintiff Stephens was deposed over the course of six non-consecutive days, and the transcripts from each separate day begin at page one. Selected pages from these depositions are grouped together as "exhibit C" in the appendix of defendants' motion for summary judgment, "exhibit K" of defendants' supplemental appendix, and "exhibit 13" in Appendix II of Plaintiff's Prima Facie Statement of Facts. The parties identify the depositions only by the date on which they were taken, but some of the transcripts do not identify the date of the deposition on every page. There are no dividers between each day's transcript, and in some cases, the Court found that two consecutive pages, both of which were cited by a party as support for one statement, were located in two separate documents.

undisputed facts and the citations there. The plaintiff could have easily removed these paragraphs from his statement of additional facts and addressed them only in response to the defendants' statement, saving the parties and the Court time and making it easier to determine what the facts of this case actually are. Defendants, for their part, deny some statements simply because they are allegedly irrelevant, or because they claim – wrongly in some cases – that a particular statement is hearsay. "The court is not required to scour the record to unearth material factual disputes or evidentiary support for a party's position." *American National Bank and Trust Co. of Chicago v. Alps Electric Co., Ltd.*, No. 99 C 6990, 2002 WL 484849, (N.D.Ill., March 29, 2002), citing to *Carter v. Am. Oil Co.*, 139 F.3d 1158, 1162 (7th Cir. 1998). Therefore, the facts that we set forth are taken from the parties' Rule 56.1 statements, and are, except where noted and to the best of our understanding, undisputed.

I.    **Facts**

    a.    **Stephens' Employment Prior to 1993**

    Stephens began working for the City in December, 1979 as a Motor Truck Driver for the Bureau of Equipment Services ("Bureau"), which later became known as the Department of Fleet Management ("Fleet"). He performed the duties of Motor Truck Driver until June, 1984, when Deputy Commissioner Halperin gave him the position of acting Training Instructor. In July, 1985, Commissioner Halperin made Stephens acting Sweeper Checker. Stephens considered these two acting positions to be promotions, although he did not receive a greater salary.[6] Shortly thereafter, Stephens was promoted to acting

    ---

    [6] The parties do not agree on what it means to be placed in an "acting" position. The City notes that
    (continued...)

3

Field Foreman of the Motor Truck Drivers in the Bureau.[7]  In June, 1986, Stephens became the Bureau's acting General Foreman and remained in this position for one year. In July, 1987, Stephens became the acting Assistant Superintendent.  During the course of Stephens' employment in "acting" roles, his official title remained Motor Truck Driver.

In January, 1988, Stephens injured his back at work.  At the time he was injured, he was again performing duties consistent with his job title of Motor Truck Driver.  Stephens took a leave of absence from his job with the City, and remained on "duty disability" leave until October, 1993.  During this period, Stephens received a salary equal to approximately 80% of his paycheck, but lost any overtime he would have received had he been working.

### b.   Stephens' Return to Work at Fleet

Around September, 1993, Stephens contacted Mary Loye, who was then the Supervisor of Personnel Administration at Fleet, to ask about returning to work.  Stephens' injury prevented him from working as a Motor Truck Driver, and the acting positions Stephens had previously held were no longer available.  He told Loye he was interested in a managerial position.  Loye told Stephens that Fleet had an available position as an Accident Adjuster.  Stephens completed an application, which included information about his mechanical background and experience.  He was interviewed for and received the job of Accident Adjuster in October, 1993.  From 1993 until at least the time of this motion, Stephens' official title was Accident Adjuster, which had a City pay level of 13.  As an

---

[6](...continued)
only union employees can officially "act up" to higher positions as a way to gain experience prior to formal promotions.  "Acting up" appears to be a different process than simply holding an "acting" title.

[7] Although the parties spend a great deal of time in their briefs explaining the application process for jobs that Stephens applied for later in his career, they do not discuss whether the promotion to acting Field Foreman was pursuant to a posted job opportunity or if it was a permanent position.

Accident Adjuster, Stephens performed adjustments on damaged City vehicles, negotiated with insurance companies and vendors for the repair of vehicles, maintained logs of repair costs and performed data entry of the repair estimates. The position did not include managerial duties.

In early 1994, Stephens met with then Deputy Commissioner[8] of Fleet, Al Fattore, to ask him about receiving a raise and/or promotion to a higher job within Fleet. Fattore indicated that although he anticipated performing a "desk audit" on Stephens' job for a possible raise, it would not occur until 1995. In October, 1994, Stephens wrote to Fleet's new Commissioner, Rick Santella ("R. Santella"), asking him about the criteria for promotions within Fleet and questioning the circumstances surrounding the promotions of several individuals.[9] Fattore responded to Stephens on behalf of R. Santella, explaining that individuals promoted in 1994 had been acting up to those positions for at least a year. The letter also informed Stephens that he needed to formally apply for any promotion he wished to receive. Stephens disputes that employees needed to apply for positions, because he believed some employees simply walked into the Fleet personnel office and were promoted without applying. He provided no evidence of anyone being promoted that way at Fleet, however.

---

[8] Job titles such as "Deputy Commissioner", "Deputy Superintendent", etc. seemed to be held by more than one person at a time within a particular department, such as Fleet. The parties do not always specify whether a particular deputy commissioner had responsibilities for only one part of Fleet management.

[9] Although it is not clear from Plaintiff's briefs, we assume that he questioned the promotions of Ernie Greb to the position of Director of Operations and Rudy Urian to the position of Deputy Commissioner, both in June, 1994. These promotions occurred without being posted and without the City conducting interviews. They were both so-called "Shakman exempt" positions, which means that the City could account for an individual's political affiliation when making its promotion decision.

### c.    Alleged Problems in Fleet's Accident Adjustment Section

After R. Santella became the head of Fleet, he began investigating what he testified were "problems" in the accident adjustment section, including inoperable vehicles, excessive repair times, staff deficiencies, and a lack of operational procedures. Plaintiff denies that the accident adjustment section suffered from any of these problems. Regardless of whether there actually were problems in the section, it is undisputed that the City's Office of Management and Budget performed an audit of the accident adjustment section which criticized the section and compared it unfavorably to the accident adjustment section at the Police Department. After the audit, R. Santella and Urian discussed ways to improve Fleet's accident adjustment section. In March, 1995, R. Santella's brother, Gary Santella ("G. Santella") transferred from his position as Manager of Vehicle Adjustments at Police to the same position at Fleet.[10]  At the same time, Stephens was offered G. Santella's old position as Manager of Vehicle Adjustments at Police. Stephens declined the position because it was a lateral transfer.

In May, 1995, Stephens wrote a letter to R. Santella and Mayor Daley, questioning the motivation of the audit and asking why it targeted a minority-led and staffed section.[11] Urian met with Stephens to determine why he had sent the letter; Stephens explained that his supervisor, Greg Benton had not received any answers to his questions about the reasons for the audit.

---

[10] Stephens disagrees with the implication that the decision to transfer G. Santella was made after the audit, but has no evidence to support his contention.

[11] At the time of the audit, the accident adjustment section was headed by Greg Benton, who was African-American.

6

In May and June, 1995, Stephens met with Urian and First Deputy Commissioner Degnan about Stephens' concerns and questions about the promotional process at Fleet. On June 2, 1995, Stephens sent a second letter to Mayor Daley about his promotion concerns. In July, 1995, Fattore – after conferring with Degnan and Urian – recommended that Stephens receive a five day suspension for his letters to the Mayor. Defendants do not cite to any disciplinary rules that Stephens violated by writing Mayor Daley and the suspension was withdrawn approximately one year after it was imposed.

Also in the Summer of 1995, the City transferred an individual named Walter West from the accident adjustment section at Police to the Fleet's accident adjustment section. At the time, Fleet was undergoing renovations, and Stephens' office was located away from the vehicles on which he was performing adjustments and away from West, who was placed in a renovated office. West's office was located where Stephens wanted to be placed.[12] Stephens testified that after West was hired, Stephens received fewer – and in his mind less important – accident adjusting duties, but he has no evidence to support his contention other than his own belief. He also believed that West was falling behind in his performance of his duties.[13]

During this time, Stephens and a co-worker, Ruth Figueroa[14] overheard a Fleet

---

[12] Stephens was moved to an office near West's several months later, as soon as the renovations were complete.

[13] Defendants object to Stephens' observation that West was behind in his accident adjusting duties as hearsay. We disagree. It is not hearsay for Stephens to testify as to what he observed with regard to West's work. If Stephens had testified that West told him he was behind in his work, it would have been hearsay to submit this statement as proof that West was not keeping up with his work.

[14] Figueroa sued the City for sexual harassment in 1999. In May, 2000, a jury returned a verdict in her favor.

7

employee named Noel Murtaugh use racial slurs to describe various ethnic groups. Figueroa testified that Murtaugh, West and Phil O'Connor instructed her to re-route accident adjustment work away from Stephens to the other accident adjusters.[15] Figueroa also testified that she heard defendant Urian as well as West use racial slurs to describe African-Americans.

### d.    Stephens' Administrative Suspension

In June, 1996, G. Santella assigned Stephens the job of photographing garbage trucks. Stephens refused and was eventually given an eight day suspension.[16]

Several times in the summer of 1996, Stephens again complained to Urian and Santella about race discrimination and Fleet's promotion policies. He also wrote R. Santella a letter complaining about allegedly discriminatory promotional practices at Fleet. On July 11, 1996, Stephens met with defendants Kane and Joyce at the direction of R. Santella. During the meeting, Stephens asked why Fleet never called him for an interview and questioned why the Manager of Vehicle Adjustments position was filled by white individuals whom Stephens believed to be less qualified than he was.[17] During the meeting, Stephens also discussed the issue of racial graffiti that appeared at various times

---

[15] Again, these statements are not hearsay because they are not being offered for the truth of the matter asserted, i.e., plaintiff is not trying to prove that Stephens fit the profile of the racial slurs or that Figueroa actually did re-route work away from Stephens.

[16] There is some confusion surrounding this suspension because the evidence shows that it was either because of Stephens' failure to photograph garbage trucks or because of his failure to complete an assignment involving salt spreaders. In both instances, Stephens contends that West failed to complete the assignment as well, although he has no evidence to back up his contention that West was ever given this assignment, let alone that he failed to complete it. Stephens believes he was suspended because he complained of race discrimination, not because he failed to complete an assignment.

[17] The parties do not identify when these promotions occurred or who received them.

in the bathrooms at Fleet.[18]

Although Joyce and Kane continued meeting with Stephens for approximately two hours, never stopping the meeting or calling security, after the meeting was over they reported to Fleet management that Stephens had yelled and pounded on the table during the meeting and that both women felt frightened and intimidated by Stephens' behavior. Stephens denies that he behaved in a threatening manner during the meeting. Kane and Joyce later met with Fleet's director of internal investigations, Sergeant Joe Chiczewski, to prepare a memo for R. Santella detailing the July 11th meeting. Based on the memo, R. Santella determined that Stephens could pose a harm to himself or his co-workers, and thus placed him on administrative leave until January, 1997.[19] Stephens returned to Fleet at the request of Nelson Nix, who was the safety director at Fleet. Immediately prior to his return, Stephens was interviewed for the position of Manager of Vehicle Adjustments; West received the promotion instead. Nix told Stephens that he was to take assignments only from West, and that he had to inform West when he left the building or went to lunch.

Plaintiff testified that after he returned to work, Fleet's personnel officer, Mary Loye, told Stephens that R. Santella had directed Urian and Fattore to harass Stephens so he

---

[18] Stephens makes several allegations regarding racial graffiti and the City's response to it, implying that various employees at the City were indifferent to Stephens' complaints about it or delayed in eliminating it. After reviewing the parties' statements, we find that Stephens' allegations regarding the graffiti are not material to his case. There is evidence that Stephens himself was sometimes not forthcoming about the locations of the graffiti. In all instances, the graffiti was painted over within a week or less of its discovery.

[19] Other than Joyce and Kane's report of what transpired at their meeting with Stephens (which Stephens denies), defendants' other evidence to justify the suspension is weak. R. Santella, who made the ultimate decision to suspend plaintiff, had never met him. Sgt. Chiczewski had never met Stephens either; he based the memo regarding Stephens' as a potential safety threat on the fact that he had once seen Stephens with watery or teary eyes, and once seen him point at another employee in a peculiar or unfriendly manner.

9

would quit.[20]  Figueroa also heard Urian tell the service office employees not to help Stephens and heard defendant Kane call Stephens a "troublemaker."[21]  Finally, Stephens testified that other service office employees told him that they had been told to direct work to the other accident adjusters, but not to Stephens.  The City admits that Stephens so testified, and does not present any evidence to dispute his contentions.

### e.    Vacation Carryover

In the Fall of 1997, Stephens asked for permission to carry over five vacation days into 1998.  Stephens testified that he needed to carry over five days because West had asked him to give up two of his planned vacation days to another employee; West signed Stephens's vacation carryover request form.  Pursuant to Stephens' union collective bargaining agreement, he was only allowed to carry over three vacation days per year; Joyce informed him of this fact in a letter in November, 1997 and suggested that he take his remaining two days before the end of the year.  Stephens did not take the remaining two days in 1997 and thus lost them.

Stephens' alleged that other union employees had been allowed to carry over more than three days in the past but he could not identify any individual by name.  Stephens' union steward testified at deposition that Stephens was entitled to carry over more than three days based on "past practice."  Plaintiff did not provide any evidence of a time in the past when he had carried over more than three days.

---

[20] Plaintiff deposed Loye during the course of discovery but apparently did not ask her to substantiate his claim that she told him that Urian and Fattore had been told to harass Stephens.

[21] Figueroa's testimony is not hearsay as long as it is not used to prove either that the service office employees in fact did not help Stephens or that Stephens was a troublemaker, but instead to demonstrate Urian's and Kane's alleged bias against Stephens.

### f.     1999 Violence in the Workplace Complaint

In June, 1999, a Fleet employee named Brezinski overheard Stephens on the telephone making the statement "everybody is going to get theirs and they're going to go down big time." Brezinski, who had never considered Stephens violent or threatening and who did not feel threatened by these comments, reported them to West. Brezinski was later asked by West to write a memo about the incident, and another one in which Stephens was overheard to say "everybody is going to go down – people you work with smile in your face and then stab you in the back." Because of the memo, Stephens had a so-called Violence in the Workplace complaint issued against him. There is no evidence that any of Stephens' co-workers ever felt threatened by him during these alleged incidents. After Stephens filed his lawsuit, on June 15, 2002, the Violence in the Workplace complaint was found to be unsustained.

### g.     Hiring Procedures At Fleet

The hiring and promotion procedures for Fleet (and, we assume, for other City departments) are complex. There are three types of job openings: Notice of Job Opportunity Jobs, Career Service Jobs, and Union Jobs. Each type had different requirements and application/hiring procedures.

For Notice of Job Opportunity Jobs (the most relevant to this case), the process begins when Fleet determines it needs to fill a position and notifies the Department of Personnel (DOP) by submitting a Request for Hire form. The Fleet personnel liaison then works with the DOP to fill the position. Whenever a Notice of Job Opportunity Job becomes available in a department, anyone can apply and is automatically put on an

eligibility list, regardless of whether they are qualified. An individual stays on the eligibility list indefinitely, so as other openings for a position become available, previous applicants do not need to reapply. Hiring for Career Service Jobs is similar, except that Career Service positions are entitled to certain job securities and Notice of Job Opportunity Jobs are at-will. For union jobs, only members of the particular union at issue may apply.

Underlying the hiring process at the City is the need to comply with a consent decree called the Shakman Decree ("Shakman"). Shakman requires that unless a particular position is exempt, no job at the City may be filled by considering an applicant's political affiliation or lack thereof.

When a position becomes available in a department (the "hiring department"), the DOP (with the help of the hiring department's personnel liaison, if needed), reviews the applicant list and selects individuals to be placed on a referral list. The referral list is supposed to be created by taking into account the job qualifications listed by the hiring department on the "B side" of the Request for Hire form. The referral list is then given to the hiring department, which then interviews the candidates and makes its selection. Although communications between the DOP and the hiring department are supposed to be recorded in memos to file, in the case of Fleet hiring, there is no evidence of such memos, although Fleet personnel liaisons communicated with the DOP on a regular basis.

The biggest dispute between the parties concerns whether Fleet followed the correct procedures for hiring. Stephens contends that Fleet exercised too much authority regarding who was placed on the referral lists. He alleges that Fleet hand-selected the individuals it wanted to hire and then told the DOP who to put on the referral list, regardless of their qualifications. Two DOP personnel analysts, Gomez and Kuras, testified that after

12

receiving a Request for Hire form from Fleet, they would call the Fleet personnel liaison to discuss the referral. For example, Mary Loye testified that she is certain she gave the DOP specific names to put on the referral list on some occasions, although she cannot remember when. Jackie Mills, Supervisor of Personnel Administration, often went to the DOP to pre-screen applicants, indicating with a highlighter whom she wanted to be referred. This practice conforms with the City's hiring procedure, as long as Mills was not a hiring decision-maker for a particular position.

Kuras testified that he did not have to refer the most qualified candidates for a job, as long as they were minimally qualified. It was up to the hiring department to choose the most qualified candidate among those referred.

Stephens also disagrees with the DOP's use of an employee's paygrade to determine experience. He contends that the paygrade does not accurately reflect experience because it does not take into account such things as acting positions an employee has held. Many employees add their acting positions to their applications for positions, but the DOP generally relies on Fleet (or other hiring department) to tell it whether a particular candidate has been performing higher level duties than their paygrade indicates. Overall, the evidence shows that the DOP and Fleet sometimes relied heavily on paygrade to determine whether an employee has enough experience to be considered for a promotion, and sometimes did not. As will be explained below, the City relies almost exclusively on Stephens' paygrade of 13 to justify its decisions not to interview him for various higher-graded jobs.

### h.    Political Connections

One of Stephens' allegations in this case is that he failed to receive certain

13

promotions not only because of his race, but also because of his lack of political affiliation with the Democratic Party. Judge Rosemond previously denied Stephens' request to conduct discovery into the political leanings of the defendants and other decision-makers in this case, and Stephens presents little evidence regarding political bias. Stephens provided general evidence that certain Fleet employees may have had connections to an Alderman Mell, and also contends that in 1994, Urian told him to contact his alderman if he wanted a promotion. There is no evidence that any of the individuals who interviewed applicants for the positions Stephens applied for were aware of the applicants', or Stephens', political affiliations, or that political ties were at all a factor in any of the promotion decisions.

### i.    Stephens' Job Applications

From the time he returned from disability leave in 1993 until he filed his lawsuit in 1998, Stephens applied for but did not receive nineteen promotions within Fleet.[22]

#### (1)    Two Shakman Exempt Positions

In June, 1994, Urian was promoted to the position of Deputy Commissioner and Greb was promoted to Director of Operations. Both of these positions were Shakman exempt and thus candidates' political affiliations could be taken into account. No application or interview is necessary for a Shakman exempt position, and neither Greb nor Urian applied for the promotions (neither did Stephens). Greb and Stephens had begun their careers at Fleet as Motor Truck Drivers at approximately the same time. After working as a Motor Truck Driver for 14 years, Greb was promoted to Director of Maintenance

---

[22] Only sixteen of the promotions are at issue at this point; Stephens has withdrawn his claims regarding three jobs.

14

Operations and then eventually Director of Operations.  R. Santella approved the promotion.

Urian's promotion was similar.  R. Santella selected Urian for this Shakman exempt job without an application or interview.  Stephens contends that he was more qualified for both of these positions than Greb or Urian but provides little evidence in support of his contention other than his resume.

### (2)    Two Manager of Vehicle Adjustment Positions

Stephens first applied for this level 16 position in February, 1995, and was found to be minimally qualified, so he was placed on the eligibility list for open positions.  As explained above, G. Santella received the first position without an interview when he was transferred from Police.  Defendant does not explain why it offered Stephens the opportunity to transfer to the same position at Police, but did not consider him for the job at Fleet.

As for the second Manager of Vehicle Adjustments position, both the plaintiff and West were interviewed for the second opening, with West receiving it in January, 1997. Apparently, Stephens was contacted while on administrative leave to interview for the job. Fleet's hiring liaison had asked the DOP to refer only individuals with Fleet experience for interviews, and Stephens and West were the only ones who qualified.  Stephens argues that he was more qualified than West for the job.

### (3)    Eight Manager of Vehicle Maintenance Jobs

Stephens applied for this level 18 job by filling out a Notice Of Job Opportunity application in September, 1995.   His name then appeared on the applicant list

15

permanently. Greb, who was Director of Operations, as well as one of Fleet's interviewers for the position, testified that Stephens did have the experience to hold the job. DOP personnel analyst Martin Gomez testified that Stephens was not qualified for a level 18 job because he was an accident adjuster, a level 13 position. The biggest areas of disagreement regarding Stephens' experience versus those hired are related to automotive experience and management experience.

The eight individuals hired into this position were hired at different times, pursuant to different hiring requests. Stephens was never referred for an interview. The first hiring request resulted in the promotions of individuals named Murtaugh, D'Antonio, and G. Santella to the position. Stephens disagrees that D'Antonio and G. Santella were qualified. Gomez testified that each of the selected individuals did have the requisite experience.

The next hiring packet promoted Correa, Kosowski and O'Connor in September, 1996. Of the nine candidates referred for interviews, five did not show up. These applicants had applied for jobs many years before and had never been taken off the eligibility list; most did not work for the City. The parties dispute whether Correa has the requisite automotive experience. At his deposition, Gomez testified (without first being able to review Correa's application), that he had referred Correa because of his race and couldn't remember if he was qualified. Gomez later submitted an affidavit in which he stated that after reviewing Correa's application, he remembered that Correa was hired because of his qualifications. Correa's only automotive experience came from less than one year managing a gas station.

After considering Stephens' application at his deposition, Gomez testified that he would have referred Stephens for an interview after confirming that he had held the acting

positions listed on his application. Gomez stated that he rarely looked at the experience listed on applications, however, which is apparently why he never referred Stephens for an interview. There is also a question of fact about whether Kosowski had management experience. Although Gomez testified that Kosowski's job as Equipment Dispatcher involved supervisory duties, the evidence (including Kosowski's resume), does not bear this out.

Finally, the evidence regarding O'Connor's experience for the Manager of Vehicle Maintenance job is even less specific than Kosowski's. O'Connor was promoted from the job of Machinist, which does not include any supervisory duties. Although O'Connor's resume lists four years of supervisory experience, Gomez testified that he rarely looked at an applicant's experience, instead relying on grade level. The parties dispute whether O'Connor had the progressively responsible automotive experience that is required for the job. Gomez testified that O'Connor did have an applicable background, but he does not explain how he came to this conclusion if he did not review applicants' backgrounds before referring them for interviews.

The final two individuals promoted to the position of Manager of Vehicle Maintenance were given their jobs via one-name referrals for interviews, which basically assured they received the job. The first referral was an individual named Gargano, who replaced G. Santella in September, 1996. Loye requested this one-name referral, but the parties do not provide much evidence about the facts surrounding it.

In July, 1999, an individual named Nelis was promoted from Motor Truck Driver to the position of Manager of Vehicle Maintenance, also via a one-name referral. Defendant refers to this promotion as a "II.4" promotion, as it occurred pursuant to section II.4 of the

17

Shakman compliance manual. Jackie Mills requested that the promotion be subject to section II.4 when she learned that doing so would eliminate the need for a formal interview process. The evidence is not clear about the reasons Mills requested that Nelis be referred. Further, although a II.4 referral is supposed to apply only to promotions within the same job category, there is no evidence that Nelis' promotion from Motor Truck Driver to Director of Vehicle Maintenance was in fact a promotion in the same category. Mills testified that Nelis was promoted because of his years of continuous service to the City, including experience supervising other Motor Truck Drivers; this experience is not significantly different from Stephens'. Basically, the evidence shows that the managers at Fleet were familiar with Nelis because of his many years of experience there and that is why he was requested for promotion.

### (4) Two Director of Maintenance Operations Positions

The Director of Maintenance Operations position is a level 19 job. Stephens applied for the position in June, 1998 by filling out a Notice of Job Opportunity application. The position required at least two years of supervisory experience and six years of automotive maintenance and repair experience. Stephens contends that he was qualified for the job, but his only proof is his resume. The first slot was filled in May, 1999 by D'Antonio, who had previously been promoted to Manager of Vehicle Maintenance in January, 1996. D'Antonio was referred via a one-name referral at the request of Mills, who learned it was a faster way to fill a position than using a Shakman II.4 memo.[23] Mills stated that D'Antonio

---

[23] The City does not explain when and why it may use a one-name referral to fill a job opening. The evidence shows that one-name referrals were primarily used when Fleet knew of a particular candidate with the requisite experience it wanted to place in a job.

18

had the right type of experience and more seniority than the other managers in the applicant pool so she requested him as a one-name referral. Mark Kuras, who was Fleet's personnel liaison at the time, believed it was logical to promote D'Antonio from his grade 18 job to the grade 19 position, so he did not check to see if D'Antonio met the qualifications listed on the B-side of the hiring request form.

The second individual promoted was O'Connor, who was also placed in the job via a one-name referral. Again, defendant is not very specific about the reasons it used a one-name referral process. The parties agree that O'Connor did not have any formal experience in the repair of motor vehicles, but that he had spent four years as the First Deputy Commissioner of the Department of General Services, which involved managing five City operating bureaus.

### (5) Two Assistant Commissioner[24] Positions

Stephens applied for these level 18 positions in August, 1998 by filling out a Notice of Job Opportunity application. Defendant states that Stephens, a level 13 Accident Adjuster, simply did not have the experience for the jobs. Both of the appointments occurred via Shakman II.4 memos after Stephens filed his lawsuit. The two individuals promoted were African-American. Jackie Mills was promoted from Supervisor of Personnel Administration to Assistant Commissioner of Personnel and Martin Bonsu was promoted from an Auditing III position to Assistant Commissioner over Auditing and Implementation. There is a dispute about whether these two promotions were within the same job

---

[24] Unlike some of the other jobs for which Stephens applied, an assistant commissioner is a category of jobs as opposed to a particular type of job. Each assistant commissioner oversees a particular type of work, for example, the two promotions at issue here were for Assistant Commissioner of Personnel and Assistant Commissioner of Accounting.

categories, as they were required to be for a Shakman II.4 memo. Defendant does not offer any proof that they were in the same categories, and plaintiff points to the City's job listings to show that the Assistant Commissioner jobs did not fall in the same categories as those which Bonsu and Mills were promoted from.

## II.    Legal Analysis

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). We must evaluate the admissible evidence supporting the motion in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). "Rule 56(c) mandates summary judgment when the nonmoving party fails to establish the existence of an element essential to its case and on which that party will bear the burden of proof at trial." *Jefferson v. City of Chicago*, No. 97 C 4895, 2000 WL 1368036 (N.D.Ill., Sept. 15, 2000) (citing *Anderson*, 477 U.S. at 252).

The standard for summary judgment cases is applied with added rigor in employment discrimination situations, where intent is usually central to the issues at hand. *See McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 371 (7th Cir. 1992). However, employment discrimination cases can also be appropriate for summary judgment when there is no genuine dispute of material fact or when there is insufficient evidence to demonstrate an alleged motivation to discriminate. *Cliff v. Board of School Commrs.*, 42 F.3d 403, 409 (7th Cir. 1994).

In this case, we find that many of the material facts are essentially undisputed,

20

although the parties do differ on the correct interpretation of some of those facts. For example, the parties generally agree that Fleet personnel liaisons often worked closely with the DOP to create referral lists for various promotions. Stephens argues that Fleet's involvement was improper, and that the DOP was not at all involved in certain referrals, but the record does not support Stephens' contention that City policies were violated, although as we explain below, certain promotions within Fleet did appear to be irregular. Similarly, the parties dispute the ultimate conclusions to be drawn from certain facts, such as whether Stephens' resume demonstrates that he was better qualified for certain promotions than the individuals who received them. However, these sorts of disputes do not involve questions of fact as much as they involve questions of law, and we are thus able to address the merits of defendants' motion, noting where appropriate if there is a dispute of fact that precludes summary judgment.

Stephens has sued the defendants under a variety of legal theories. He has sued Kane, Joyce and R. Santella in their individual capacities for violations of 42 U.S.C. § 1981 and § 1983. He has also sued the City for municipal liability under §§ 1981 and 1983, as well as for violations of Title VII. In addition to its arguments in support of their motions for summary judgment, the defendants also allege that certain of Stephens' claims are either time barred or otherwise improper. We will address each argument in turn.

## A.     Statute of Limitations

The City claims that Stephens should not be able to recover for being denied promotions to the Deputy Commissioner position filled by Greb and the Director of Operations position filled by Urian in June, 1994 because they are barred by the statutes of limitations for both §§ 1981 and 1983 claims, as well as Title VII. Further, the City

21

claims that Stephens' §§ 1981 and 1983 claims regarding the Manager of Vehicle Adjustments position filled by G. Santella in May, 1995 is similarly time-barred. Section 1981 and 1983 claims must be brought within two years of the alleged discrimination. *Smith v. City of Chicago Heights*, 951 F.2d 834, 836 n.2 (7th Cir. 1992). Thus, any alleged discriminatory actions which occurred prior to February 9, 1996 are time barred unless Stephens can demonstrate that it is appropriate to toll the limitations period.

Title VII requires a plaintiff to file a charge of discrimination with the EEOC within 300 days of the alleged discrimination. Thus, the City argues, the applicable limitations period for Stephens' Title VII claims is February 17, 1995 (300 days before he filed his first charge), and the first two promotion denials listed above should be excluded under Title VII as well.

Stephens argues that we should include the untimely promotion denials under the continuing violation theory, which allows a plaintiff to seek relief for allegedly discriminatory acts that occurred outside the limitations period by linking them to acts within the period. *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992). In the employment discrimination context, the plaintiff must demonstrate that "there has been a pattern or policy of discrimination continuing from outside the limitations period into the statutory limitations period, so that all discriminatory acts committed as part of this pattern or policy can be considered. . . timely." *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir. 1999) (citing Peatzold & O'Leary, *Continuing Violations and Hostile Environment Sexual Harassment: When is Enough, Enough?* 31 AмBus.L.J. 365 (1994)).

In determining whether to apply the continuing violation doctrine, the Seventh Circuit considers three factors: 1) whether the alleged acts of discrimination involve the same

subject matter; 2) the frequency at which they occurred; and 3) their degree of permanence, which should trigger an employee's awareness of and duty to assert his or her rights." *Selan*, 969 F.2d at 565.

In this case, it is undisputed that Stephens began questioning Fleet's promotional policies in late 1994, and specifically began mentioning race as a factor in those policies in 1995. He filed his first charge of discrimination with the EEOC in December, 1995, about nine months after he did not receive the position of Manager of Vehicle Adjustments that was given to G. Santella. It is not unreasonable to conclude that it was this third loss of a position that finally triggered Stephens' awareness that the two earlier promotion decisions might have been discriminatorily motivated as well. Thus, we will not bar his Title VII claims on statute of limitations grounds.

We do find that Stephens' §§ 1981 and 1983 claims are time-barred. The continuing violation doctrine only applies until such point in time when a plaintiff knows or should reasonably know that he or she might be suffering from discrimination. In this case, Stephens was aware of his claims against the City at the latest when he filed his first charge of discrimination in December, 1995, yet he did not file his lawsuit until two years and two months later, over three and one-half years after the first two promotion denials. We find it is not reasonable to allow Stephens to toll his §§ 1981 an 1983 claims to a date outside the two-year statute of limitations, since he was aware of the promotion denials before then and we will bar him from recovering for the promotions given to Greb and Urian in 1994 and G. Santella in 1995.[25]

---

[25] Even if Stephens' claims regarding the first two promotion denials were not time-barred, we would
(continued...)

23

Although we find that Stephens' Title VII claims for the Greb and Urian promotions are not time barred, we hold that he cannot obtain any relief because they are not fairly encompassed within his EEOC charges. Generally, a plaintiff may not bring an employment discrimination complaint in federal court without first having filed a charge of discrimination with the EEOC. Only those acts of discrimination raised in the EEOC charge may be part of a later lawsuit. *See, Chambers v. American Trans Air, Inc.*, 17 F.3d 998, 1003 (7th Cir. 1994) ("[O]nly those claims that are fairly encompassed within an EEOC charge can be the subject of a resulting lawsuit.") For a claim to be fairly encompassed within an EEOC charge, it must be "like or reasonably related" to the charge, and could be expected to grow out of the allegations in the charge. *See Gawley v. Indiana University* 276 F.3d 301, 313 (7th Cir. 2001). At a minimum, the charge and the complaint "must describe the same conduct and implicate the same individuals." *Cheek v. Southern and Western Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994).

Given this standard, Stephens' first two promotion denials are not fairly encompassed by either EEOC charge, although we do find that the remaining promotions are encompassed by his second charge, which he filed in November, 1997. Stephens filed his first charge of discrimination on December 18, 1995. In it, he claimed that he had been discriminated against on the basis of his race because he was denied a promotion to the

---

[25](...continued)

grant summary judgment for the City with regard to these positions, as we explain later in this opinion. The G. Santella promotion is a closer question, since the facts surrounding it are more suggestive of pretext. However, it is undisputed that Stephens believed his failure to receive this promotion was discriminatory, and thus, he still did not file suit within the two year statute of limitations. Thus, it is not fair to allow Stephens to link this untimely promotion to one within the limitations period, since it was not an event within the limitations period which first alerted Stephens to the fact that he may be suffering from discrimination. In any event, we only bar Stephens from recovering under §§ 1981 and 1983 -- his Title VII claim is still viable.

position of Manager of Vehicle Adjustments in August, 1995. This was the position that was filled when G. Santella transferred to Fleet from Police with approval of R. Santella. In his charge, he did not mention the Shakman exempt appointments of Greb or Urian, which had occurred over a year earlier. As we explained above, we allowed Stephens to use the continuing violations doctrine to toll the statute of limitations until this third promotion denial, finding that it was the trigger that made him aware that the first two promotion denials might have involved discrimination. However, given this awareness, there is no explanation for Stephens' subsequent failure to include the two promotions in his charge to the EEOC. Thus, he cannot maintain his Title VII claim with respect to these two promotions.

All of the promotion denials that occurred after Stephens filed his second charge in November, 1997 are fairly included in that charge. In the charge, Stephens complained about his failure to be promoted to ten different positions. After he filed his charge, he failed to win promotion to six more positions. Although the exact decision-makers for each job may have been slightly different as individuals moved around at Fleet and the DOP, the hiring department remained the same, as did the City's reasoning for not interviewing or promoting Stephens on each occasion. Thus, we will allow his Title VII claims to stand.[26]

### B.    Claims Against the City

Stephens claims that the City discriminated against him in violation of §§ 1981, 1983 and Title VII when it denied him promotions to sixteen positions. He also claims that the City violated Title VII by subjecting him to racial harassment and retaliation. Although §

---

[26] Both Stephens' racial harassment and retaliation claims are plainly discussed in his second charge as well.

1981 and Title VII proscribe different types of discrimination, their methods of proof are essentially the same, *see Johnson v. City of Fort Wayne, Indiana*, 91 F.3d 922, 940 (7th Cir. 1996), so we will address those claims together.

      1.    Promotion Denials – Title VII and § 1981

Stephens may use either direct or indirect evidence to demonstrate that the City discriminated against him on the basis of his race. *See Simmons v. Chicago Bd. of Ed.*, 289 F.3d 488, 492 (7th Cir.2002). In this case, as in most employment discrimination matters, there is no direct, or "smoking gun" evidence, so Stephens must proceed under the indirect method first set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* method, Stephens must first make a prima facie case of discrimination. In a failure to promote case, this involves demonstrating that: 1) he was a member of a protected class; 2) he was qualified for the position sought; 3) he failed to receive the position; and 4) the employee promoted was not a member of the protected group and was less qualified than the plaintiff. *See Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 732 (7th Cir., 2001).

Once the plaintiff makes a prima facie case of discrimination, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for its action. After the defendant satisfies its burden, it is up to the plaintiff to demonstrate that the defendant's reason is pretextual, that is, a lie, or not the real reason for its action. To prove pretext, the plaintiff must show: 1) defendant's explanation for its actions had no basis in fact; 2) the explanation was not the real reason; or 3) the reason given was insufficient to support the action. *See, Hoffman-Dombrowski v. Arlington International Racecourse, Inc.*, 254 F.3d

644, 652 (7th Cir. 2001).

Initially, the City argues that Stephens cannot maintain a prima facie case with respect to the two Assistant Commissioner positions that were filled by African-Americans Mills and Bonsu. We agree, and thus grant the City's motion for summary judgment with respect to these promotions on Stephens' Title VII and § 1981 claims.[27]

Next, the City argues that Stephens fails to show that he was qualified for any of the other promotions he sought, or at least that he was not as qualified as the successful individuals, and thus that he failed to prove factors two and/or four of the prima facie case. The City relies solely on Stephens' grade level – 13 – as compared to the levels of the positions he sought, as its reasoning for not promoting him (or even interviewing him) for all of the positions except the Manager of Vehicle Adjustments positions given to G. Santella and West. Stephens argues that the City unfairly failed to account for his significant managerial and vehicle experience which he gained during his various acting positions prior to his disability leave, and that his resume demonstrates that he was more qualified than the successful candidates for each position.

We agree that Stephens cannot show he was more qualified than the successful candidates for the Deputy Commissioner position filled by Greb and the Director of Operations position filled by Urian in June, 1994. Stephens had been back at Fleet after a five year absence for less than eight months and had been hired into a level 13 position. Greb was promoted to Director of Operations from the position of Director of Maintenance

_____

[27] The cases cited by Plaintiff do not hold otherwise. In *De Lesstine v. Fort Wayne State Hosp.*, 682 F.2d 130, 133 (7th Cir. 1982), the plaintiff, an African-American, was terminated and replaced with a female and the Court held that he could still make a prima facie case. The other cases cited by the plaintiff do not involve promotions of individuals in the same protected class.

27

Operations, which he had held since 1992 and Urian had been Director of Operations. There is no evidence that Stephens had more experience than these two individuals or that the City was unreasonable in failing to consider Stephens for the positions, which were not posted or filled by a formal interview process. Thus, we grant the City's motion for summary judgment on Stephens' Title VII claims with regard to these two positions.

With regard to the rest of the promotions, we find that Stephens does succeed in making a prima facie case that he was qualified to hold the positions. The question of whether the successful candidate was less qualified than Stephens really collapses into our analysis of whether the City's proffered reasons for not giving Stephens a promotion was pretextual. That is, the City argues that Stephens cannot make a prima facie case because he was not qualified to hold the positions **and** less qualified than the successful candidate, and then argues alternatively that if we find Stephens can make a prima facie case, the same reasons support the City's decision not to promote him. Because Stephens was not even referred for an interview, and thus never had the opportunity to demonstrate his experience to the hiring panel, we will find for the purpose of this motion that he did make a prima facie case, and will analyze the City's reasoning for not promoting him at the pretext stage of the *McDonnell Douglas* test.[28]

In reviewing each of the City's promotion decisions, we must deny summary judgment as to some of them because we find, at the least, a question of fact about

---

[28] Two of the positions Stephens' sought were for the job of Director of Maintenance Operations, a level 19 position. This was the highest level position Stephens sought. Although it seems more reasonable for the City to argue that Stephens was not qualified for the level 19 jobs, at least one of the individuals who got this job was previously promoted to the Manager of Vehicle Maintenance job, where he obtained the experience necessary for his next promotion. Since Stephens never received an interview for the Manager of Vehicle Maintenance job, he could not obtain the necessary experience to be promoted further. However, we will not fault him for this failure at the prima facie stage.

28

whether the City's reasoning is pretext. The City proffers a non-discriminatory reason for each of its promotion decisions – the selected individual was more qualified than Stephens – and argues that Stephens cannot prove that any of the reasons are pretext. It is not enough for Stephens to show that the City made a business error in selecting another individual over him, he must show that the City lied about its reasons, which raises an inference that it was trying to hide its actual, discriminatory purpose. *See Wells v. Unisource Worldwide*, 289 F.3d 1001, 1006, (7th Cir. 2002) (*citing Grube v. Lau Indus., Inc.*, 257 F.3d 723, 730 (7th Cir. 2001)).

As we explained above, we grant summary judgment for the City on Stephens' claims regarding the June, 1994 positions received by Urian and Greb. We similarly grant summary judgment to the City with regard to the promotion to Manager of Vehicle Adjustments filled by West in February, 1997. Stephens was interviewed for this position and received lower interview scores than West. Despite his own belief that he was more qualified than West for the job, Stephens fails to show any facts that support his argument that the City was not honest about its reasons for selecting West for the position. CASE

Next, we deny summary judgment with regard to the Manager of Vehicle Adjustments position filled by G. Santella in May, 1995.[29] The City argues that G. Santella merely transferred from the same position at Police to Fleet, and that he had a superior background to Stephens, especially since Stephens had recently returned from a five year absence. However, the City does not explain why it offered Stephens the opportunity to transfer into the Manager of Vehicle Maintenance position at Police that G. Santella had

---

[29] As we explained above, we granted summary judgment on Stephens' § 1981 claim regarding this position on statute of limitations grounds, and so we only analyze his Title VII claim.

just vacated, and does not deny that Stephens denied the transfer because it would have been a lateral move. Thus, there is a question of fact about the legitimacy of the City's reasons for the promotion of G. Santella, and we deny the City's motion for summary judgment with regard to Stephens' Title VII claim and § 1981 claim for this position.

There are too many questions of fact surrounding the eight promotions to Manager of Vehicle Maintenance and two promotions to Director of Maintenance Operations for us to grant the City's motion for summary judgment with regard to these positions. Although the City continues to rely on Stephens' grade level as its reasoning for not even giving him an interview, the record contains examples of the City failing to follow its own procedures for referring candidates for interviews, and other situations where an individual's grade level was not taken into account.[30] Specifically, some of the interview referral lists created by the DOP personnel analyst and/or the Fleet personnel liaison appear to rely on factors such as Fleet employees' personal knowledge of a particular employee it wanted referred, as opposed to the candidate's grade level. This on its own may not be a questionable employment practice, but the evidence shows that the City may have ignored Stephens' managerial and other experience even though it took such experience into account for other employees. Additionally, for at least one hiring packet, relating to the 1996 promotions of Correa, Kosowski, and O'Connor, the City referred for interviews certain non-City employees who had applied for jobs years earlier, and who did not have City pay grades to demonstrate their experience, while ignoring the fact that Stephens' resume

---

[30] We do recognize that Stephens' grade level of 13 is lower than the grade level of any of the successful candidates. However, given the number of questions we have about the hiring process in general, and the fact that we do not know the grade levels of every individual referred for an interview, we cannot say that Stephens' low grade level versus those of the successful candidates automatically demonstrates that none of the City's reasons for its hires were pretextual.

demonstrated similar, if not better, experience. Indeed, DOP personnel analyst Gomez testified that he would have referred Stephens for an interview if he had reviewed Stephen's experience listed on the "B side" of his application, and one of the interviewers, Greb, testified that he believed Stephens had the necessary qualifications for the Manager of Vehicle Maintenance job.

There is also a question about the way two of the promoted employees were first placed on the referral list. There is no evidence that Kosowski's equipment dispatcher position did involve managerial duties, although Gomez later testified that he thought it did. Even more problematic is the fact that the only way O'Connor's supervisory experience was apparent was from a review of his resume, yet Gomez testified that he rarely reviewed anything other than grade level before referring an individual for interview. Given these inconsistencies, we are not satisfied that there is a legitimate explanation for the reasons the City sometimes considered a candidate's background and sometimes did not, especially since the determinations always worked to Stephens' detriment.

Another reason we find a question of fact regarding the promotions to Manager of Vehicle Maintenance and Director of Maintenance Operations is that several of the promotions involved so-called "one-name" referrals that did not appear to follow any set procedures. We have almost no information about Gargano's promotion at all. As for Nelis, we cannot discern exactly why Mills requested this promotion as a one-name, Shakman II.4 referral, especially since such a referral specifically accounts for an individual's background and experience beyond pay grade. Although a II.4 referral is supposed to be limited to employees in the same job category, the City never demonstrated (or even argued) that Nelis' promotion was in the same category as the

31

position from which he was promoted, and there is evidence that it was not.

Both of the promotions to Director of Maintenance Operations also occurred via one-name referrals. These referrals, however, were not made pursuant to a II.4 memo, and as we point out in the fact section, the City does not explain the criteria for such a referral. At the least, there is a question of fact about why the City hand-picked certain individuals for promotion, often based on subjective criteria such as the desire of a particular personnel liaison, but consistently denied Stephens many promotion opportunities based solely on his grade level.

Because the circumstances surrounding the promotions to Manager of Vehicle Maintenance and Director of Maintenance Operations leave many open or unanswered issues, we find there is a question of fact regarding whether the City's reasons for promoting other individuals instead of Stephens are pretextual. Thus, we deny summary judgment with regard to Stephens' Title VII and § 1981 claims for these jobs.

    2.  Racial Harassment

Next, Stephens argues that he suffered a racially hostile work environment in violation of Title VII. We disagree that any racial animus Stephens faced rose to the level of hostility that is actionable under Title VII, and thus grant summary judgment for the City on this issue. In order for racial harassment or hostility to be actionable under Title VII, it must be so pervasive or severe that it alters the terms and conditions of employment. *Smith v. Sheahan,* 189 F.3d 529, 532 (7th Cir. 1999). Determining whether a work environment is hostile involves consideration of "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

32

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). To put it another way, "[t]he workplace that is actionable is the one that is 'hellish.'" *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997) (citing *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995).

Given the above standard, we cannot say that Stephens' work environment was so hostile as to be actionable under Title VII. He alleges that various co-workers occasionally made derogatory comments about African-Americans. However, few of the comments, if any, were directed at him personally and none of them were threatening. Stephens did not even hear many of the comments himself, they were relayed to him by a co-worker. And other comments, such as third-party reports that various supervisors at Fleet told employees to steer calls away from Stephens, do not contain a racial aspect.

As for the instances of graffiti, although the content was despicable, the City always took steps to have the graffiti removed within days of its discovery, and there is no evidence that any of it was directed towards Stephens. In short, although racially derogatory comments should not be uttered or tolerated in any workplace, the environment in which Stephens worked was not so hostile as to make his employment conditions intolerable or hellish.[31] Thus, we grant summary judgment to the City on this issue.

### 3. Retaliation

Next Stephens alleges that the City retaliated against him in violation of Title VII on several occasions when it took disciplinary action against him after he complained of discrimination. In order to prove actionable retaliation, Stephens must show, 1) he

---

[31] Stephens alleges that the fact that he worked for a time in an office in a less desirable location than that of the White accident adjuster, there is no evidence that this placement was related to Stephens' race or for any reason other than the fact that Fleet was undergoing renovations.

engaged in protected activity; 2) he suffered an adverse employment action; and 3) there is a causal link between the protected activity and the adverse employment action. *See Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 653 (7th Cir. 2001).

Throughout his employment at Fleet, Stephens has engaged in protected activity by complaining about his perceptions of race discrimination in the department. He claims that because of these complaints, he has suffered several different types of adverse employment actions: 1) disciplinary suspensions; 2) reduction in the number and importance of his work assignments; 3) denial of overtime; 4) loss of vacation carryover; and 5) being the subject of an unwarranted Violence in the Workplace complaint. As an initial matter, we find that only the suspensions, loss of overtime and the violence in the workplace complaint are true adverse actions. An adverse employment action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady v. Liberty Nat'l Bank & Trust*, 993 F.2d 132, 136 (7th Cir. 1993).

In this case, the evidence does not support Stephens' contention that any changes in his work responsibilities were either material or substantial; he provides very little evidence regarding the alleged changes to his work assignments at all. Next, the undisputed evidence shows that Stephens did not lose any vacation time, he was merely informed that, pursuant to union policy, he could only carry over three days, and thus had to take his remaining two days before the end of the year. There is no evidence that this rule was different for Stephens than for any other employee at Fleet, and thus it was not

an adverse action. Thus, we grant summary judgment to the City on Stephens' retaliation claims concerning his work assignments and vacation carryover.

Next, although Stephens' alleged loss of overtime is arguably an adverse employment action, there is no evidence that his failure to receive overtime in the Winter of 1999 was in any way connected to his complaints of discrimination. The parties provide almost no evidence about this issue at all, and we do not find that it constitutes actionable retaliation, so we grant summary judgment to the City on this issue.

We do deny summary judgment with regard to two of Stephens' claims, those relating to his September 1995 and August, 1996 to January, 1997 disciplinary suspensions and the Violence in the Workplace complaint, because we find there is a question of fact about whether there is a causal connection between Stephens' complaints and the actions taken.[32] First, Stephens' 1995 suspension for writing letters to the Mayor was implemented even though the City could point to no policies or rules that Stephens violated; the suspension was rescinded a year later. As for Stephens' August, 1996 to January 1997 suspension, even accepting as true that Stephens banged on the table and raised his voice during his meeting with Joyce and Kane regarding his complaints of discrimination (and there is a question of fact about this), the subsequent five month suspension seems disproportionate to the allegations. The two individuals directly responsible for the suspension, R. Santella and Sgt. Chiczewski had never met Stephens, did not have any other evidence against him regarding alleged threatening or violent

---

[32] The questions surrounding these two issues relate both to whether there is a causal connection between Stephens' complaints and the discipline, and whether the City's "legitimate, non-discriminatory reasons" for the challenged decisions are pretextual. *See Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir. 1994). The questions of causal connection and pretext blur in these instances.

35

behavior, and Sgt. Chiczewski's comment that he once saw Stephens with "watery eyes" seems a particularly weak justification for the suspension. The entire course of events suggests the question of whether the City was actually trying to get a perceived "complainer" out of the office for a time in order to end further complaints of discrimination.

The Violence in the Workplace complaint similarly seemed a particularly harsh reaction to a couple of overheard comments. We find there was a question of fact about the reasons the City issued this complaint against Stephens, and thus we deny summary judgment with regard to this incident and the two above-mentioned suspensions.

     4.     Section 1983

Stephens next argues that the actions of the City deprived him of his right to be free from race discrimination, in violation of the 14th Amendment and 42 U.S.C. § 1983. In order to find a municipality liable under § 1983, a plaintiff must show that the alleged unconstitutional actions of the municipality's employees were taken pursuant to an official policy or custom. *See Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691 (1978). Thus, in order to demonstrate that the City is liable for his injuries, Stephens must show that the City had an official policy of discrimination. *See McTique v. City of Chicago*, 60 F.3d 381, 383 (7th Cir. 1995). That is, "[o]ne way or another, the policy must be shown to be that of the municipality itself." *Simmons v. Chicago Bd. of Ed.*, 289 F.3d 488 (7th Cir. 2002).

In order to show that a municipality's policy has violated his rights, Stephens must show one of the following: 1) an express policy that, when enforced, causes a constitutional violation; 2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a `custom

36

or usage' with the force of law; or 3) an allegation that the constitutional injury was caused by a person with final policymaking authority. *McTique*, 60 F.3d at 382. Stephens alleges that the City has a general policy of failing to protect African-Americans from race discrimination. His complaints primarily stem from his perception that the steps the City took to address his allegations of discrimination were inadequate. Specifically, he argues in his brief in opposition to summary judgment that "the failure of the City to address racist graffiti at Fleet and other complaints of race discrimination shows that Defendant City is responsible under *Monell* for having a custom of failing to address race discrimination complaints."

We grant summary judgment for the City because Stephens has failed to show the existence of either a formal policy or a widespread longstanding practice that has the force of law. He has not pointed to any express City policy, and instead appears to be arguing that the City has a widespread practice of failing to address discrimination complaints. In order to survive summary judgment, Stephens must offer "more than isolated incidents of constitutional deprivation." *B.A.L. v. Apple*, No. 00-0068-C-B/G, 2001 WL 1135024 (S.D.In., Sept. 21, 2001) (citing *Gustafson v. Jones*, 117 F.3d 1015, 1022 (7th Cir. 1997). Further, a plaintiff must show "that the municipal action was taken with the requisite degree of culpability and must demonstrate a causal link between the municipal action and the deprivation of federal rights." *Board of County Commissioners of Bryan Country v. Brown*, 520 U.S. 397, 403 (1997). This he fails to do.

Stephens argues that Joyce and Kane, who met with him regarding his complaints, did not have any formal training in dealing with race discrimination claims, and that his numerous complaints to the City about discrimination went unanswered. Further, he

alleges (but the evidence does not support) that the City failed to respond to the graffiti he observed in various bathrooms. Stephens provides no evidence to support his allegations that other African-Americans at Fleet were subjected to similar behavior. The undisputed evidence shows that although Stephens may not have been satisfied with the response he received from various City officials about his complaints, his complaints were not ignored. More importantly, he provides no evidence whatsoever, other than his own speculation, that the City had an informal policy of discrimination so longstanding or widespread that policymaking officials must have known about it and failed to stop it. *See McNabola v. CTA*, 10 F.3d 501, 511 (7th Cir. 1993). This is not enough to demonstrate municipal liability under § 1983 and thus we grant summary judgment for the City on this issue.

     5.    Political Patronage -§1983

Stephens next contends that the City has violated 42 U.S.C. § 1983 by infringing on his First Amendment rights because it unlawfully accounted for political affiliation in making its promotion decisions. In order to prove that his political affiliation, or lack thereof, was a factor in his failure to receive promotions, Stephens must prove that his conduct (political affiliation or lack) was constitutionally protected, and the protected conduct was a substantial factor in the decision not to promote him. *Garrett v. Barnes,* 961 F.2d 629 (7th Cir. 1992). Once plaintiff makes a prima facie case, the burden shifts to the defendant to show that the plaintiff would not have been hired regardless of his political affiliation. *Id.*

As an initial matter, Stephens cannot recover for the two positions that were Shakman exempt, meaning that the City could account for an applicant's political affiliation in filling the job. Thus, to the extent they have survived our previous rulings, we grant summary judgment on Stephens' claims regarding the June, 1994 positions given to Greb

and Urian.

Next, the City notes that Judge Rosemond previously held that "unless [Stephens] was qualified for the positions for which he applied, the political affiliation or political sponsorship of the individuals promoted over him is irrelevant." Since we have found that Stephens at least made a prima facie case that he was qualified for the remainder of the promotions he sought, we cannot grant summary judgment on this basis.

We can grant summary judgment on Stephens' political patronage claims, however, because Stephens fails to demonstrate that political affiliation was a factor either in his failure to receive any of the promotions or in the appointment of the successful candidates. Stephens provides very little evidence regarding political affiliation at all, other than a couple of stray remarks by a co-worker that "clout" had taken care of him and general comments that Fleet had some sort of connection to an alderman. The undisputed evidence shows that none of the decision makers involved in the promotions at issue knew of the candidates' political backgrounds, and there is no evidence that politics was discussed at all during the interviews. *See Cusson-Cobb v. O'Lessker*, 953 F.2d 1079,1080 (7th Cir. 1992). Thus, there is no evidence that Stephens' lack of political affiliation was a factor in the decisions not to promote him, or in the decisions to promote the successful candidates. We grant summary judgment to the City on Stephens' political patronage claims.[33]

---

[33] Even the placement of G. Santella in the position of Manager of Vehicle Adjustments, a transfer approved by his brother, R. Santella, does not demonstrate that Stephens' failure to get this position was racially motivated. Although the transfer smacks of nepotism, this is not the same as political favoritism. *See Bryon v. Clay*, 867 F.2d 1049, 1051 (7th Cir. 1989) (nepotism is not forbidden under the First Amendment).

## C. Claims Against the Individual Defendants

In addition to his claims against the City, Stephens makes certain allegations against R. Santella, Kane, and Joyce, in their individual capacities. He alleges that certain actions by each individual constituted race discrimination in violation of 42 U.S.C. §§ 1981 and 1983, as well as illegal patronage practices in violation of § 1983.

### 1. Race Discrimination – §§ 1981 and 1983

Proof of intentional discrimination against a defendant in his or her individual capacity requires the same standard for § 1981 and § 1983, so we will analyze these claims together. *See*, *Friedel v. City of Madison,* 832 F.2d 965, 971 (7th Cir. 1987). Section 1983 provides a federal cause of action for "the deprivation under color of law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States." *Gossmeyer v. McDonald*, 128 F.3d 481, 489 (7th Cir. 1997) (*citing Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994)). To prevail on his § 1983 claim against R. Santella, Joyce, and Kane in their individual capacities, Stephens must show that they were directly responsible for the actions that allegedly deprived him of his Constitutional rights, in this case, his rights to Equal Protection under the Fourteenth Amendment. *See Moore v. State of Indiana*, 999 F.2d 1125, 1129 (7th Cir. 1993). An individual is directly responsible for a Constitutional violation "if the conduct . . . occurs at [his] direction or with [his] knowledge or consent." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (*citing Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1989). "In other words, the defendant must 'know about the conduct, facilitate it, condone it, or turn a blind eye. . .'" *Gentry,* 65 F.3d at 561 (*citing Jones v. City of Chicago*, 856 F.2d, 985, 992 (7th Cir. 1988).

40

Finally, to support a claim under § 1983, a plaintiff also must show that the individual defendant acted (or failed to act) because of the plaintiff's race. *See Nabozny v. Podlesny*, 92 F.3d 446, 453 (7th Cir. 1996). The plaintiff must demonstrate intentional or purposeful discrimination to show an equal protection violation. "Discriminatory purpose, however, implies more than intent as volition or intent as awareness of consequences. It implies that a decision maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing adverse effects on the identifiable group." *Deerwester v. Isham*, No. 94 C 1186, 1999 WL 160255 (N.D.Ill., March 9, 1999) (*citing Nabozny*, 92 F.3d at 453 (internal citations omitted)).

Stephens alleges that Santella was intimately involved in many of the actions that Stephens contends are discriminatory. He alleges that Santella ignored Stephens' complaints of discrimination, was responsible for issuing both the 1995 suspension and the 1996 administrative leave (and relied on a racist depiction of Stephens in support of the leave), and oversaw the process by which Stephens was denied promotions.

We partially denied the City's motion for summary judgment as to Stephens' Title VII and § 1981 claims against it because we found questions of fact regarding whether the City had discriminated against Stephens. As to R. Santella's individual responsibility, we grant his motion for summary judgment as to all issues except that concerning the five month administrative suspension. Santella had never met Stephens at the time the events described above were occurring, and in most cases, Santella's role appears to be that of an approval mechanism for promotions, suspensions, etc. Although some of the procedures by which Stephens was suspended or denied promotion were unusual enough to raise the question of pretext by the City, there is nothing which demonstrates that

Santella intentionally discriminated against Stephens, or even was deliberately indifferent to his rights because of Stephens' race. Thus, we grant summary judgment to Santella on Stephens' individual §§ 1981 and 1983 race claims with regard to the promotion issues and the 1995 suspension. However, we found a question of fact about the City's motivation for Stephens' five months suspension, and find a similar question of fact about R. Santella's intent in implementing it. Thus, we deny summary judgment to R. Santella on Stephens' individual §§ 1983 and 1981 claims regarding the five month suspension.

Kane and Joyce are entitled to summary judgment as to all of Stephens' claims. Stephens argues that Kane conspired with Joyce to cover up his complaints of discrimination and brand him as a psychotic individual, and that these allegations are enough to support his individual race claims against them. Although such bare allegations, without more, might be enough to survive the motion to dismiss stage, Stephens offers no evidence in support of his "conspiracy" theory. The undisputed evidence shows that Kane had no input into the promotion process or disciplinary process; she was merely an administrator who implemented decisions made by others. And although she participated in the investigation of Stephens' complaints, there is no evidence that she falsified her report because of an intent to discriminate against Stephens because of his race. For the same reasons, Stephens' §§ 1981 and 1983 race claims against Joyce are denied as well, and we grant summary judgment to both women.[34]

2. Patronage Practices – § 1983

Finally, we grant summary judgment to all three individual defendants on Stephens'

___

[34] Stephens does not maintain an argument that Joyce's letter denying him the right to carry over more than three vacation days is evidence of discrimination and thus we do not address this issue.

§ 1983 claims of patronage practices for the same reasons we granted summary judgment to the City. Even assuming, arguendo, that any of the individuals were responsible for any of the promotion decisions, there is no evidence that political affiliation, or lack thereof, played a role in any promotion or promotion denial.

## III.    Conclusion

For the reasons stated above, we grant summary judgment as to all claims against all three individual defendants except for Stephens' §§ and 1981 1983 claims against R. Santella. We grant in part and deny in part Stephens' motion for summary judgment against the City as follows: we deny the City's motion for summary judgment with regard to Stephens' claims that the City violated § 1981 and Title VII when it denied him promotions to the Manager of Vehicle Adjustments position filled by G. Santella, all eight Manager of Vehicle Maintenance positions, and the two Director of Maintenance Operations positions. We also deny summary judgment on Stephens' Title VII retaliation claims regarding his 1995 suspension and 1996 administrative leave. We grant the remainder of the City's motion for summary judgment, including Stephens' § 1983 claims, his Title VII claim regarding racial harassment, and the remainder of his Title VII and § 1981 promotion claims. It is so ordered.

ENTER:

MICHAEL T. MASON
United States Magistrate Judge

Dated:    September 5, 2002

43